Our next case this morning, your honor, is 25-1031, United States v. Jose Perez. Appellant's counsel, please. Good morning, your honors, and may it please the court, Eamon Hart on behalf of Appellant Jose Perez, Jr. I'd like to reserve two minutes with rebuttal. You may. Thank you, your honors. The defense's entire strategy at trial in this case was to question the accuracy and the completeness of the evidence that the government put on. Now that strategy was undermined fatally by three errors of the district court, and I want to jump right into the first one we've raised in the brief, which is the 404B-403 issue. So the defense was willing to stipulate that Mr. Perez had qualifying convictions for the purpose of the felon possession charges, but the government's request went beyond that. And over the defense's objection, the district court permitted to be omitted two things. One, a 2017 conviction for selling firearms, and two, perhaps most critically here, the underlying facts of a 2020 conviction also for conspiracy to possess with intent to distribute. Now the problem here is what the government suggested is that's relevant, that comes in to prove intent or to disprove an innocent involvement defense. There was no innocent involvement defense. I mean, I guess this is where I don't, I lose the threat, I guess. So I understand accuracy and completeness, but that by itself, that just is a way to question that this person did it. I mean, because the investigation was shoddy, you don't know that he did it, so there's a reasonable doubt that he did it. But the government needs to rebut that. You had some things that were a little bit imperfect about the investigation. They need to deal with that, and they're dealing with that through saying, wait a minute, yeah, there were some imperfections, but he did this same crime with the same modus operandi, all these same facts in 2020, so those imperfections don't lead you anywhere, jury. That's what they need to do to rebut what you're saying. And that's where I kind of lose your sort of threat. I think, Your Honor, that's exactly the problem, because it wasn't, to be clear, this wasn't modus operandi, right? This was intent and innocent involvement. Those were the issues that the government raised in terms of bringing it in, and I think that's exactly the problem, is that the government essentially is saying to the jury, he intended to conspire to distribute drugs before, therefore he probably intended to do it again. That's essentially a propensity argument. That's saying, if he's in a car with drugs and cash and a firearm, he's intending to conspire to distribute weapons, or distribute narcotics. He did that once in 2020, jury, you can believe he did it again here. That's propensity reasoning, and that's exactly the type of reasoning that's been identified as problematic in Henry and other cases. So, counsel, on the issue of special relevance, are you indicating that there has to be something explicit in the way that the defense is proceeding that would establish a special relevance? In other words, would you have to be arguing that this was a mistake, or an innocent mistake, or that I didn't know what I was doing, or I never intended? Would the defense have to be that explicit in order for the government to argue the special relevance that 404B recalls? Why couldn't those defenses be implicit in what you were trying to do at trial? I don't disagree that they could be implicit, but I think it's context dependent for every case. And what happens here, recall, is this question gets decided before any evidence comes in pre-trial on a motion in limine. I'm not arguing that that's categorically impermissible in every case, but what you have here is the trial judge says, before trial even starts, well, you know, there's some precedent that says intent before, intent later, in a drug case, I'm letting it in, and then that pretty much forces the defense's hand. They have to stipulate that this comes in with the underlying facts of 2020. So there are cases, I mean, the government points cases in its brief, and we pointed out in the reply, the facts are distinguishable, right? So in a case like Henry, right, the door gets open because it's a possession with intent to distribute case, but the defense says, well, he could also convict on simple possession, right? So implicitly, they're saying, we're bringing in his intent. Here, all of the defendants cross, right? Everything is focused on not questions of intent or state of mind, it's, you know what, Jerry, you actually shouldn't believe the facts that the government's witnesses are telling because they're unreliable or incomplete for a variety of reasons. And I want to just go back to a question that you asked earlier, Judge Ephraim. It's never a defendant's burden to tell an alternative story of the facts. No, but it's the government's burden to prove a case beyond a reasonable doubt. I fully agree. And so you said a bunch of stuff about an imperfect investigation. They may have no response to the errors. They're trying to prove something different than you, which is this guy did it beyond a reasonable doubt. And I thought the cases say that, you know, that it's not character, which is what 404B is about, when you've done sort of the same, right down to some pretty specific details, kind of offense earlier. Now, you know, you need a limiting instruction like we had here, but that that idea that if you did this thing before, that's different than character is what I understand a lot of the cases to say. Two points on that, Your Honor. You know, if this were a modus operandi thing, then maybe that analysis fits in. But here, what the government's argument was about mens rea. They weren't arguing it's a modus operandi thing. It's they're saying intent. He intended to do this before, therefore, he intended to do it again. And that's exactly the type of thing that gets warned about Judge Kayada's concurrence, and Henry is really specific on this. The, sorry, do you have a question? So, I mean, I think your argument going out to all of the factual detail that was in the stipulation, the similarity between the 2020 conviction and the conduct here is really kind of extraordinary. I fully agree it's extraordinary, Your Honor. I thought you might. So, it's almost inescapable that a jury that was trying to sort this out would come to the propensity inference. Well, good Lord. Absolutely. He did this before almost precisely. And he doesn't do it again. It doesn't help that in closing, the prosecutor specifically says, this is no mistake. Look at 2020 and points out all the similarities. I think it was Veridakis. That was identified as a problem by the court. In the opener, the prosecution in that case said, well, he's started a fire before, right? That's exactly propensity reasoning. And to go back to your question earlier, one thing I wanted to add is, yes, the defense puts on, it contests the facts, but the government's offering this for mens rea, not actus reas, right? So, that's the key disconnect here. The government's saying, oh, no, no, you can consider this for intent. But what we said in our brief, if you believe the government's witnesses, there's good circumstantial evidence of intent. The entire strategy at trial by the defense was to say, actually, you shouldn't believe them because here are all the gaps. That may or may not be a successful strategy, ultimately, but that was the strategy, and it's a perfectly legitimate strategy. It's not enough to say that a defendant has to offer some alternative version that the jury can believe. Sorry. Right, but that's not their job. That's your job, is to create alternative, you know, whatever. Find reasonable doubt. But their job is to prove it beyond a reasonable doubt. So, you're operating on two tracks. So, the question is, like, did they do something that, you know, getting to Judge Lopez's question, you know, and I have trouble making this distinction in my mind between propensity and then our cases do talk about, you know, very specifically doing the same thing, isn't propensity. It's something else. I find that something else, harder to articulate, and I'll ask Mr. Lockhart that, but, you know, this goes to knowledge, whose drugs are in the console. I mean, all these things that they need to prove. I see my time is out. Do you mind if I offer a response to that? Again, you're right. It's two tracks. And I think the key disconnect here is the government says it's offering for a mens rea purpose, but the defense has to do with the actus reas, right? Like, that's what's being attacked here. And to your question about this being difficult to parse, I agree it is difficult to parse. There is a number of cases that talk about it being difficult to parse. Verodakis talks about, well, there's a push and a pull here because the more specially relevant it is because of similarity, the more 403 prejudicial it is. So, there's some sweet spot that you have to land in. And then in Henry, Judge Kayada's concurrence, which is joined by Judge Thompson, says, you know, look, we're coming really close to saying if he's intended to deal drugs before, he's intended to do it again. That looks really problematic under 404. And maybe that means we need to take this on bonk. Now, we pointed out in our brief, I think here, because the need for the evidence at trial was so sparse and the prejudice so strong, this is the exceptional case where you can say, you know what, actually there is an abuse of discretion here. So, I do not think that Manning needs to be revisited on bonk to get to a reversal here. But I will say that's an open question that judges on this court have raised is have we strayed too far into admitting 404B evidence? I see my time's expired. There are other issues that I'm happy to address if the court has questions. And you'll have a couple more minutes. Thank you. Good morning. Donald Lockhart for the government. May it please the court. I'd like to actually start with the point that the district court here found that there was at least an implicit defense of innocent involvement. And granted, just our burden itself to prove these elements beyond a reasonable doubt figures strongly in the 404B calculus. But I want to be clear that the defense in opening statement made a very conscious effort to shift the blame to the co-defendant in this case. There were four principal themes raised in that defense opening. You see them at joint appendix pages 205 through 209. The first theme was that Del Rio, the co-defendant, lingered longer in the car before running, the implication being that he was fiddling around with the drugs and the guns that remained in the car. Second theme was that Perez, the defendant here, quickly surrendered, whereas Del Rio kept trying to escape. The third theme was that two bags of drugs were found next to Del Rio in the woods, whereas no bags of drugs were found near Perez. And the fourth theme was that Perez never managed to vault the fence into the woods, so he was never near the drugs. But let's concede for argument purposes the special relevance point. Why did the government push so hard to include in the stipulation, I mean, there was an offer to accept that the 2017 conviction, 2020, those can come in, but the government insisted on all of this detail, which almost precisely mirrored the conduct in this case. Why did you, not you personally, but why did the government insist on all of that detail in the stipulation? What was the purpose of that? Right. So, remember that it's not just that we have the burden beyond a reasonable doubt as to these elements, it's also that this defendant is trying to distance himself from the drug. Basically say, in the wrong place, at the wrong time, didn't have the intent. I'm innocent for that reason, but what's the purpose of all the detail? What are you hoping to get the jury to do? How are you asking the jury to think about this case in light of all that detail? What are you asking them to conclude? What we're asking them to conclude is that there is no mistake or accident happening here and we know that from the fact that, for example, take the 2017 conviction, a conviction for dealing firearms without a license. This is a defendant who knows about guns. He's dealt with guns. This is what I guess I was asking. So, articulate for me, so you have this litany of very specific facts and it can't be propensity. And so, tell me why it's something else and how the jury does that without relying on propensity. Because the jury doesn't need to say this is a bad actor who, by dint of his prior convictions, is the kind of bad guy we think is going to commit future drug crimes. The district court gave a cautionary instruction saying that's the sort of propensity inference that you're not allowed to draw. What the jury does here is say, okay, this is a defendant who, at trial, is suggesting to us that he's in a car driving at a high rate of speed with a co-defendant. There are drugs and a gun. And whoops, I just didn't happen to know any of these things were the case. It makes it very unlikely that he didn't act knowingly and intentionally. For example, that he didn't know that the drugs in the console, this baseball-sized bag of drugs, the chunky white substances, were crack cocaine. And I differ with my brother on how our argument approached this issue. We didn't ask the jury to draw a propensity inference. We said, and I quote, this is to rebut an innocent bystander to defense. It is, quote, it shows that the defendant had the state of mind or intent necessary to commit the crimes charged in the indictment. And that's because he's a drug dealer, right? This is where I find it all. It's not the simplistic label of drug dealing. It's his conduct in the earlier cases, which tells you something about his intent at the time of the events that happened here. Remember that the very similarity between the 2020 facts and the facts here is something that increases the special probative value. And the district court appreciated that it also increases the risk of unfair prejudice. That's why Judge Saylor said that is the more substantial, as he put it, question. And the judge did two things to mitigate that risk of prejudice. Number one, insisted that the parties craft narrow stipulations concerning the facts. And in the case of the 2017 conviction, there were really no underlying facts at all. And two, gave two very powerful cautionary instructions. If you look at the cautionary instruction given when this evidence actually came in, it's quoted in full on page 20 of the brief. It's pretty remarkable, I think. You've seen a lot of instructions like this. But have a look at it. It's quite forceful. It's quite detailed. It's quite comprehensive. And this is the sort of seat of the pants judgment call that the district court had to make. And we think, supportably determined, that on balance, the potential for prejudice here did not substantially, substantially outweigh the very high relevance of this evidence for abutting the defense. And I would just point out on the issue of need, because need is a factor in the 403 analysis, this is not a case where we had undercover recordings of the defendants discussing drug dealing. Well, it's strange you say you need, and then you argue harmless error. Those don't really line up that well. Well, no, need is, well, my point is that my brother said that this was a case where we didn't actually need this evidence. My point is... But now you say here, the evidence was overwhelming without it. Well, yeah. It is. We had an overwhelming, powerful, circumstantial case, but we did not have direct evidence on intent in the form of recorded conversations or admissions of the defendant. But yes, that's... Well, they say that's because it was such a shoddy investigation, there were opportunities you had to get more direct evidence, but you didn't do it. I'm sorry. Let me... Yeah. You don't have to respond to that. Sure. But I do want to ask you about the Rule 806 issue. It does seem to me that the court made a number of legal errors in that ruling, but I want to ask you about one, the conclusion that we did not have sort of non-testimonial hearsay here. You had testimony that I think Barry gestured to Evelyn to come behind the stop and shop and pointed to, if you look there, you will find two bags of cocaine. Why isn't that... In essence, that's what he's saying to him, I've been back here before, there was cocaine here. You go there, you're going to find it. I mean, that strikes me like that's a gesture that's full of narrative. And the court found no. There's no testimony here. So we stridently disagree with that. I mean, the mere gesture of Sergeant Barry to these drug bags does not constitute, as a threshold matter, an intentional assertion of particular bags. Did the government argue that the drugs were found behind the stop and shop in the woods? Yes, and Detective... So what other evidence was there other than Barry pointing at it, which led the guy to take the picture? Detective Evelyn spoke about the drugs and Del Rio was captured on that side of the fence in the woods. So the placement of the drugs was never in dispute. There was no defensive planting here. So unless you posit that some of the officers just sort of had on hand two bags of drugs that they were going to cast into the woods after reacting to a situation where a car Where is Del Rio arrested? In the woods? Del Rio was arrested on the other side of the fence in the woods, face down, in a creek, wearing a ski mask. How far from where these drugs are found? We don't know precisely how far, in part because there was no real attempt on cross-examination of Evelyn to say, well, what are the precise distances? So the evidence is the guy is arrested some distance away. Evelyn is told by Barry, take a picture of those drugs. And then the government argues those drugs were found where Evelyn took the picture. Well, I mean, again, this is not a situation where, may I continue, where the gesture itself is saying, I was the one who found the drugs and I didn't move them. That's apparently what you're reading into the gesture. But the more natural inference is that Barry is simply telling Evelyn to process the drugs as he did. It was the defense's burden to show an intentional assertion of particular facts through that gesture. That's what the advisory committee notes say. That's what this court said in Hensel. The defendant never attempted to satisfy that burden. And as we pointed out, as the trial at USAID pointed out, we weren't offering that gesture for any truth of the matter asserted. We were offering it as context for why it was that Evelyn came to process those drugs. But in any event, I mean, any conceivable error here was harmless for the reasons we say. What's the obligation of the defendant to have to make some kind of record to figure out the prejudice? Should they have asked to voir dire Evelyn if he knew anything about the disciplinary action against Barry? Like, what has to happen there? Yes, that's one of the points we make in the red brief, which is that the defense attorney here says, we want to ask three questions of Detective Evelyn, apparently concerning Barry and the earlier disciplinary report concerning Barry. There's no record and the defense never says what those three questions were. Moreover, and as I think you're alluding to, there's no attempt even to ascertain through voir dire of Evelyn whether he even has pertinent information concerning this earlier disciplinary report. So right now, there's a gap in the record concerning whether Evelyn even knew anything relevant that he could have testified that would have had an impeaching effect on Sergeant Barry. For all we know, he might have said, I have no idea what that report was about or, oh, I heard something about it, but I don't really know the details. Well, they could have. I mean, if they were to question Evelyn, I don't, again, I don't, you say the three questions they describe are not in the record at all? No, there's none. The defense brief suggests that the trial defense attorney made clear what those three questions were. That's not true. If you look at the transcript pages, you're never going to see the defense attorney explaining what the three questions were. Okay. But obviously, defense counsel understood that they represented, did they not, that there was in Officer Barry's record evidence that he had been found to be dishonest and was disciplined by the department for that dishonesty. That representation was made to the court. Is that correct? That was, but the missing link is whether Evelyn, who's on the stand, knows anything about that disciplinary report and can testify concerning it. There's an even further issue, which we note toward the tail end of our argument in the red brief on this, which is that there's a split in the case law over whether and to what extent 806 modifies 608B's ban on impeachment through extrinsic evidence. So there are a whole host of sort of problems here about, like, A, did Evelyn even know anything pertinent? And B, how far could the defense have gone? Well, clearly under the rules, he had to accept, if he had been permitted to ask questions of Evelyn, he couldn't try to then impeach what Evelyn said. He would have to accept what the witness's responses were. That's clear under the rules, right? That part may be clear, but again, we go back to the point that there's nothing in the record suggesting that Evelyn even knew about this disciplinary report or could have testified about it in any sort of meaningful way or offered. I think what the defense was suggesting that Evelyn might have testified somehow that, yes, I was aware of the report, the details of the report, and in consequence, I think that this Sergeant Barry is untrustworthy or not believable. But this just gets to how we would do some kind of harmless or error, right? The error would be not to allow the question. We don't know how the question would have been answered. It could have been answered, I know all about that. Here are the details, or I know nothing about that. And what we can't do because we don't have anything is to address how this error harmed the defendant, right? I think it's a further point that undermines any attempt to show that the alleged error was harmful. It's one among many points, but a more overarching point is that none of this little dispute about where the drugs were precisely in the forest matters unless you think that there was planting going on or some effort. What do you make of the drugs were warm? Right. Evelyn testified that the drugs were still warm. Which is weird, right? I mean, that's weird. Well, the defense had a field day with that issue on cross-examination, and they mined that issue. I mean, I guess you keep saying, like, there's no evidence of planting, but that's a very inconsistent fact. And now we have the officer who pointed it out, and potentially he's a dishonest person. I guess I don't know. Maybe they did say, like, we're not pursuing planting. I don't know what they are pursuing then because there seems to be the facts to stand up and try to say that if they got in everything they wanted to. Well, a couple things. Notice that the defense actually disclaimed any intent of presenting a planting defense, told the district court straight up, we're not doing that. Now, the reply brief says, well, there were some nods in the defense argument to planting. But think about it. This is a reactive scene. A car has crashed. The officers are coming to it. The jury is supposed to think that one of the officers just so happens to have a couple of bags of drugs that resemble the one in the console of the car, and they're just going to cast those drugs into the woods? There's weird facts on both sides. What is the explanation for the warm drugs? Well, I don't know what the explanation is for the warm drugs. And it may depend on your definition of warm. I mean, the defense, again, cross-examined Evelyn to the hilt on this issue. It's a weird fact. I grant you there's awareness. We're keeping you a long time. This is obviously an interesting case for many reasons. But the name Barry has come up over and over and over again. He was the officer apparently in charge of the investigation, never called by the government to testify. So we get into this whole missing witness instruction. And, again, the court seemed to make a number of legal errors in how it was supposed to analyze that issue. Okay. So, number one, he's not the officer who is the case agent. He was the one who was in charge of the scene that night in terms of people collecting evidence and so forth. That doesn't make him the agent for the whole case. He wasn't. He was on the scene that night and was the officer in charge of collecting evidence. He was not the case agent. He just wasn't. Second, if you adopt the defense position on this missing witness issue and say that any officer who's involved at a crime scene is somehow legally unavailable by dint of their official position, then what that means is in a case where eight officers respond to a crime scene, and as is often the case, we only call several of them, not all of them, because we don't need to know, you know, who brought the bags to the trunk and who put them in the driver's seat. Then the defense gets a missing witness instruction saying, you can infer that the government didn't call these five other officers, that they would have testified adversely to the government. That, to our mind, is not a tenable rule. There is nothing about Berry that made him factually unavailable. In fact, the defense admitted they could subpoena him and that they hadn't. We told the district court that we were prepared to bring him into court personally and make him available to the defense. They didn't choose to do that. So in a situation where the defense feels so stridently that a witness like this is important to their case, there's recourse. They can call that witness. We're not suggesting a defendant has a burden to do that, but if the officer's testimony is that critical, if it's really the linchpin of the case and the defense is planning to, you know, present some sort of a planting defense, well, then why don't you call Sergeant Berry? Thank you, Mr. Talker. May it please the court, there's quite a lot in there, and I'll try to go as quickly as I can. Going in reverse order, our argument is not and has never been that every law enforcement officer is irreparably, favorably disposed to the government and non-cumulative. Here, though, Berry's in charge of the scene. We can quibble about his specific title, but there's trial testimony that he's the one in charge of processing evidence. And more critically, he's the only one who finds the drugs, right? Snell arrests Del Rio, but Snell doesn't testify that he found drugs on him. And then Evelyn's the only other officer back there 90 minutes later, and Evelyn says, I got called back and Berry pointed these out to me. Evelyn doesn't testify that he found the drugs. So Berry has unique information, and because he has unique information and he's in charge of the scene, if he doesn't testify favorably to the government, the government's case implodes. So that's why he's legally unavailable. Going on to the hearsay issue, I agree. Tell me again why the case implodes, if what? If he doesn't testify favorably to the government. I mean, if he comes on the scene. You could have called him. You chose not to. There is something to a broad rule like Mr. Lockhart's right. We don't call. The government does not call all the officers. So how do you decide? I mean, that seems to be like the prosecution makes that decision in the first instance, and the defense has every right to do what it wants, and you didn't. So I don't really see. And where I think we have to be very careful is imposing a burden on the defense to call witnesses, which it can't be compelled to do. Now, again, if three officers go into the woods together and one of them is Barry, Barry doesn't need to testify. That's not right. You're not compelled to do anything. You did nothing wrong by doing nothing, and it might be best to leave it out there and argue the drugs were warm. You call in Barry, who knows what he'll say. That's great. That's a great thing to do. But these are choices you have to make. But the rule you want creates all sorts of odd incentives that probably aren't good for trial management. May I speak to that? Yeah, I mean, I think the rule we would want is when they have unique information to the investigation, which Barry does, and when they're not called by the government, then that is an error. Because, I mean, I can't speak for the government. You'd have to ask the government. If Barry's not giglio-impaired, he's the first witness. I mean, I think that's what's going on here, right? He has a problem, and they can't call him. Because if they do call him, he's going to get impeached. So that's where I see the problem here. I'm happy to speak more to the hearsay issue. I know that the buzzer's gone off. Well, we gave Mr. Lockhart plenty of time, so that's fair. And as if you would like to stand with the hearsay issue. Sure, and I'll be brief. Again, I don't think there's any way to read this record as Barry's gesture isn't coming in for its truth, right? Because, again, no one else is back there. Evelyn doesn't have any knowledge of the recovery of the drugs absent Barry saying, look here. And I want to speak briefly, too, to the sort of idea that trial counsel should have done something differently in the colloquy here. I would encourage the court to kind of review that entire colloquy. It's in the addendum to the brief. But, basically, it starts off with legal error, both by the argument of the AUSAs and the court, basically saying, well, 806 requires unavailability. He's not unavailable. So start with the legal error. Then, at various times, trial counsel actually gets cut off in proffering. He says, well, I'm going to ask him three questions, gets cut off mid-sentence. Then he says, he agrees, I'm going to be bound by what he says. I'm not having a mini-trial here. If he gets up there and says, are you aware of a disciplinary record, and Evelyn says no, well, it's a bad look. All right, so what do you say if we reject your other arguments, just hypothetically, and we're left with this one and we think you're right, and then there's nothing there to know what the answer would have been? How do we deal with that in the harmless error context? Well, I think in the harmless error context, I mean, you have to be looking here at whether it's, I'm trying to remember the exact phrasing, highly probable. And I don't think you can say that here because, again, he tries to get in. Questions here. He tries to get that in. He gets shut down at every stage. So I don't think you can place that on defense counsel here. And then I don't think it's harmless because if this comes in, and if Evelyn says, yeah, you know, Barry did lie in our internal investigation, and we found him to be not truthful, that's a pretty big problem. Right, but you made that part up. We don't know that Evelyn would have said that. That's my question. And there's no way we could know because the trial counsel wasn't allowed to ask the question. I mean, I don't think that falls at trial counsel's feet. He says this is what I want to ask. The court says, well, you know, he's not here. If you call him, we can deal with it then. But he's not here, so I'm not letting it happen. So I gather your harmless argument is, I mean, no defense is put on. Everything hinges on the credibility of the government witnesses and their account. And the 806 issue, the missing witness, those all go to the credibility of the government witnesses. Absolutely. Well, that's not true of the 404B403. That's not a credibility issue. How does that relate to credibility, I guess? I'd say it's credibility adjacent, and I guess what I mean by that is if you were a fence-sitting juror, right, and you're thinking, well, on the one hand, these folks have testified, and here's this camera that shows this. Well, but on the other hand, there are some gaps here, right? The firearm, there's no pictures of where it's picked up. There's a contamination issue with the chain of custody. The drugs are warm. I mean, it's a facially implausible story about the drugs. The drugs are warm 90 minutes later and dry on a December night after we recovered. Come on. I mean, that's not plausible. So there's a lot for a jury here to say, you know, even if I think it's more likely than not, I just don't see it beyond a reasonable doubt here. Then you have the 404B hammer of, guess what? He did this exact same thing before. So if you're a fence-sitting juror, that is going to blow you off to the other side, right? That's the key problem here, and that's why it is cumulative error, because you have two errors that deal primarily with credibility, right? The 404B error and the missing witness error, right? And then you've got, I'm sorry, the hearsay error and the missing witness error, and then what you have is the 404B issue, which, you know, maybe if that doesn't come in, I don't know which way the needle moves, but here, with that coming in, if you're a juror, it is just impossible, right? I mean, I get that there's a presumption that juries follow instructions. I'm not arguing that that presumption is incorrect, but there are exceptions to every rule. I don't think the government has articulated here, under its theory, any case where as long as there's limited instruction in a drug case, prior drug offenses don't come in. I don't see that they've ever articulated that here, and I think this is a case where limiting principles are important. Thank you, counsel. Thank you, Your Honors.